Barrett, Circuit Judge, dissenting.
History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are dangerous . Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons. Nor have the parties introduced any evidence that founding-era legislatures imposed virtue-based restrictions on the right; such restrictions applied to civic rights like voting and jury service, not to individual rights like the right to possess a gun. In 1791-and for well more than a century afterward-legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety.
18 U.S.C. § 922(g)(1) and Wisconsin Statute § 941.29(1m) would stand on solid footing if their categorical bans were tailored to serve the governments' undeniably compelling interest in protecting the public from gun violence. But their dispossession of all felons-both violent and nonviolent-is unconstitutional as applied to Kanter, who was convicted of mail fraud for falsely representing that his company's therapeutic shoe inserts were Medicare-approved and billing Medicare accordingly. Neither Wisconsin nor the United States has introduced data sufficient to show that disarming all nonviolent felons substantially advances its interest in keeping the public safe. Nor have they otherwise demonstrated that Kanter himself shows a proclivity for violence. Absent evidence that he either belongs to a dangerous category or bears individual markers of risk, permanently disqualifying Kanter from possessing a gun violates the Second Amendment.[1]
I.
At the outset, it is worth clarifying a conceptual point. There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people-for example, violent felons-who fall entirely outside the Second Amendment's scope. See, e.g. , Binderup v. Attorney Gen. U.S. , 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he *452 Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms."). Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda , 56 UCLA L. REV. 1443, 1497-98 (2009) (describing these competing views). These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.
In my view, the latter is the better way to approach the problem. It is one thing to say that certain weapons or activities fall outside the scope of the right. See District of Columbia v. Heller , 554 U.S. 570, 627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (explaining that "the sorts of weapons protected were those 'in common use at the time' " (citation omitted)); Ezell v. City of Chicago , 846 F.3d 888, 892 (7th Cir. 2017) ( Ezell II ) ("[I]f ... the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.' " (citation omitted)); Ezell v. City of Chicago , 651 F.3d 684, 702 (7th Cir. 2011) ( Ezell I ) (drawing an analogy between categories of speech, like obscenity, that fall outside the First Amendment and activities that fall outside the Second Amendment). It is another thing to say that certain people fall outside the Amendment's scope. Arms and activities would always be in or out. But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required.
To be sure, under this theory such a person could possess a gun as a matter of legislative grace. But he would lack standing to assert constitutional claims that other citizens could assert. For example, imagine that a legislature disqualifies those convicted of crimes of domestic violence from possessing a gun for a period of ten years following release from prison. See United States v. Skoien , 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (holding constitutional 18 U.S.C. § 922(g)(9), which forbids those convicted of crimes of domestic violence to possess a gun). After fifteen years pass, a domestic violence misdemeanant challenges a handgun ban identical to the one that the Court held unconstitutional in Heller . Despite the legislative judgment that such a person could safely possess a gun after ten years, a court would still have to determine whether the person had standing to assert a Second Amendment claim. If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the statutory disqualification expires. If domestic violence misdemeanants are out, they're out.[2]
That is an unusual way of thinking about rights. In other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional *453 constraints). Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected.[3] So too with the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes eligible to lose it.
In addition to being analytically awkward, the "scope of the right" approach is at odds with Heller itself. There, the Court interpreted the word "people" as referring to "all Americans." 554 U.S. at 580-81, 128 S.Ct. 2783 ; see also id. at 580, 128 S.Ct. 2783 (asserting that "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" (citation omitted)). Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.
Thus, I treat Kanter as falling within the scope of the Second Amendment and ask whether Congress and Wisconsin can nonetheless prevent him from possessing a gun.
II.
Heller did not "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," but it did offer a list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." See Heller , 554 U.S. at 626-27 & n.26, 128 S.Ct. 2783. Like the majority, I am "reluctant to place more weight on these passing references than the Court itself did." See Maj. Op. at 445 (quoting United States v. Meza-Rodriguez , 798 F.3d 664, 669 (7th Cir. 2015) ). The constitutionality of felon dispossession was not before the Court in Heller , and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear. For example, does "presumptively lawful" mean that such regulations are presumed lawful unless a historical study shows otherwise? Does it mean that as-applied challenges are available? Does the Court's reference to "felons" suggest that the legislature cannot disqualify misdemeanants from possessing guns? Does the *454 word "longstanding" mean that prohibitions of recent vintage are suspect? As we observed in Skoien , judicial opinions are not statutes, and we don't dissect them word-by-word as if they were. 614 F.3d at 640. Thus, I agree with the majority that Heller 's dictum does not settle the question before us.
It does, however, give us a place to start. Heller 's reference endorses the proposition that the legislature can impose some categorical bans on the possession of firearms. See id. ("That some categorical limits are proper is part of the original meaning."). Our task is to determine whether all felons-violent and nonviolent alike-comprise one such category.
Wisconsin and the United States advance three basic historical arguments in support of this categorical exclusion. First, they say that there is some evidence suggesting that founding-era legislatures deprived felons of the right. Second, they argue that because the states put felons to death at the time of the founding, no one would have questioned their authority to take felons' guns too. And third, they insist that founding-era legislatures permitted only virtuous citizens to have guns, and felons are not virtuous citizens.
As I explain below, none of these rationales supports the proposition that the legislature can permanently deprive felons of the right to possess arms simply because of their status as felons. The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than "felons"-it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.
A.
The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing-or explicitly authorizing the legislature to impose-such a ban. But at least thus far, scholars have not been able to identify any such laws. The only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to criminality. See, e.g. , Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment , 82 MICH. L. REV. 204, 222, 266 (1983) ; Steven P. Halbrook, The Right of the People or the Power of the State: Bearing Arms , 26 VAL. U. L. REV. 131, 147, 185 (1991); see also C. Kevin Marshall, Why Can't Martha Stewart Have a Gun? , 32 HARV . J.L. & PUB. POL'Y 695, 712 (2009) ("For relevant authority before World War I for disabling felons from keeping firearms, then, one is reduced to three proposals emerging from the ratification of the Constitution.").
A majority of the New Hampshire convention recommended that a bill of rights include the following protection: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion ." See 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891) (emphasis added). In the Massachusetts convention, Samuel Adams proposed to protect the right to arms with the following language: "And that the said Constitution be never construed to authorize Congress to ... prevent the people of the United States, who are peaceable citizens , from keeping their own arms." See 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A *455 DOCUMENTARY HISTORY 675, 681 (1971) (emphasis added). Finally, the influential Pennsylvania Minority suggested an addition stating: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals ...." 2 SCHWARTZ , supra , at 662, 665 (emphasis added). On the basis of these three proposals some conclude that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." See, e.g. , Kates, 82 MICH. L. REV. at 266.
Several things bear emphasis here. First, none of the relevant limiting language made its way into the Second Amendment. Second, only New Hampshire's proposal-the least restrictive of the three-even carried a majority of its convention. See 2 SCHWARTZ , supra , at 628, 675, 758. Third, proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion. See Kates, 82 MICH. L. REV. at 222 (citing 1 ELLIOT , supra , at 328, 335). And finally, similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment. See Eugene Volokh, State Constitutional Rights to Keep and Bear Arms , 11 TEX. REV. L. & POL. 191, 208 (2006) (North Carolina, Pennsylvania, Vermont, Massachusetts). All that said, these proposals may "indicate some common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms." Marshall, 32 HARV. J.L. & PUB. POL'Y at 713. And at a minimum, the fact that they are routinely invoked in support of blanket felon disarmament makes it necessary to consider them.
I'll begin with the New Hampshire proposal, which did not embrace the disarmament of all felons, but rather of those citizens who "are or have been in actual rebellion ." 1 ELLIOT , supra , at 326 (emphasis added). This limitation targeted a narrow group because "rebellion" was a very specific crime. See Rebellion , 2 NEW UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (4th ed. 1756) (explaining that the term is "now used for a traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation"). There are obvious reasons why the government would take guns away from those bent on overthrowing it, and, as I discuss later, stripping rebels of their gun rights followed well-established practice in both England and the colonies. Thus, while this proposal reflects support for disarming rebels, it does not say anything about disarming those who have committed other crimes, much less nonviolent ones.
Samuel Adams's proposed language to the Massachusetts convention, which would have limited the right to "peaceable citizens," see 2 SCHWARTZ , supra , at 681, sweeps more broadly-but not so broadly that it encompasses all criminals, or even all felons. At the time, "peaceable" was defined as "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773). Those who "breach[ed] the peace" caused "[a] violation of the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." See Breach , NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828); see also Atwater v. City of Lago Vista , 532 U.S. 318, 327 & n.2, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (noting some "variations in the common-law usage of the term 'breach of the *456 peace' " but assuming that the definition "entail[ed] at least a threat of violence"); id. (quoting MICHAEL DALTON, THE COUNTRY JUSTICE 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used in terrorem. ")); Pearce v. Atwood , 13 Mass. 324, 332 (1816) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not."). Not all crimes are violent; nor, for that matter, is every non-peaceable person a criminal. In short, the phrase "peaceable citizens" was not a synonym for "non-felons" or even "non-criminals."
That leaves the strongest support for a blanket felon exclusion: the Pennsylvania Minority's suggested guarantee of the right to arms "unless for crimes committed, or real danger of public injury from individuals." 2 SCHWARTZ , supra , at 665. This proposal can be read in two ways. The first, which would support a broad exclusion, is to interpret it as capturing two groups: (1) those who have committed any crime-felony or misdemeanor, violent or nonviolent-and (2) those who have not committed a crime but nonetheless pose a danger to public safety. The second, which would support a more targeted exclusion, is to interpret it as capturing one group: those who pose a danger to public safety, whether or not they have committed a crime. On this reading, the catchall phrase limiting the rights of individuals who pose a "real danger of public injury" would be an effort to capture non-criminals whose possession of guns would pose the same kind of danger as possession by those who have committed crimes. And unless the founding generation understood all crimes-even nonviolent misdemeanors-to be markers for that risk, the relevant "crimes committed" would be the subset of crimes suggesting a proclivity for violence. (As far as I can find, no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants.) If "crimes committed" refers only to a subset of crimes, that subset must be defined; using "real danger of public injury" to draw the line is both internally coherent and consistent with founding-era practice.
Whatever else may be said about the particulars of each of these three proposals, they are most helpful taken together as evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms. The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury. See Binderup , 836 F.3d at 368 (Hardiman, J., concurring in part and concurring in the judgments). This is the same concern that animated English and early American restrictions on arms possession.
In England, officers of the Crown had the power to disarm anyone they judged to be "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662). Relatedly, English common law "punish[ed] people who [went] armed to terrify the King's subjects" with imprisonment and forfeiture of their "armour."[4] Sir John Knight's Case , 87 Eng.
*457 Rep. 75, 76 (K.B. 1686). And-perhaps unsurprisingly because they were presumptively thought to pose a similar threat or terror-Parliament also disarmed Catholics. See JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 18-19, 122 (1994) (explaining that Protestants feared revolt, massacre, and counter-revolution from Catholics); see also ADAM WINKLER, GUNFIGHT 115 (2011) (explaining that Parliament disarmed Catholics because the Protestant majority found them "untrustworthy"); Marshall, 32 HARV. J.L. & PUB. POL'Y at 723 ("In short, the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king.").[5]
Similar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place. See ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 22 (2001) ("Although the colonial demand for such discriminatory controls sprang from circumstances different from those in England, as in applying them against Indians and blacks, colonists usually followed home-country practices of excluding other distrusted people from ownership."). In some places, Catholics were still disarmed, but "on the basis of allegiance, not on the basis of faith." See Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment , 25 LAW & HIST. REV. 139, 157 (2007) (citing Virginia's 1756 "disarmament of all those refusing the test of allegiance")[6] ; see also DECONDE , supra , at 22-23 (associating Catholics with the "distrusted inhabitants" from whom the colonies seized guns "with the intent of preventing social upheavals" and "rebellion"). Those "willing to swear undivided allegiance to the sovereign" were permitted to keep their arms. See Churchill, 25 LAW & HIST. REV. at 157. After all, confiscation of guns from those who refused to swear an oath of allegiance was meant to "deal with the potential threat coming from armed citizens who remained loyal to" another sovereign. See Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control , 73 FORDHAM L. REV. 487, 506 (2004) ; see also NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives , 700 F.3d 185, 200 (5th Cir. 2012) ("American legislators had determined that permitting [those who refused to swear an oath of allegiance] to keep and bear arms posed a potential danger.").
*458 But that particular threat dissipated when a person pledged his allegiance to the United States or to a particular state.
Slaves and Native Americans, on the other hand, were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course. See MALCOLM , supra , at 140-41; WINKLER , supra , at 115-16 (noting "forcible disarmament" out of "fear that these groups would use guns to revolt" or otherwise threaten the "public safety"); DECONDE , supra , at 21-22 (noting "anxiety that slaves would rebel"). And this practice of keeping guns out of the hands of "distrusted" groups continued after the Revolution. For example, many states even constitutionalized the disarmament of slaves and Native Americans. See Volokh, 11 TEX. REV. L. & POL. at 208-09.[7]
In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons.
B.
A common response to the dearth of felon-disarmament laws in the eighteenth and nineteenth centuries is to say that such laws would have been unnecessary given the severity with which felons were punished. Because felons were routinely executed or stripped of all rights, the argument goes, explicit provisions depriving them of firearms would have been redundant. See , e.g. , Brief of Defendant-Appellee Brad D. Schimel at 9 ("[I]n eighteenth-century America, felonies were punishable by death, so no early American lawmaker would have questioned the propriety of a proposal to disarm serious offenders."); Medina v. Whitaker , 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). One scholar puts it this way:
The constitutionality of [bans on felon possession] cannot seriously be questioned ... [because f]elons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms.
Kates, 82 MICH. L. REV. at 266. On this view, the criminal law provides a historical justification for felon disarmament even if laws regulating gun safety do not.
The premise of this argument-that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries-is shaky. While it accurately describes the punishment of felons at English common law, the American picture is far more complex. It is true that at common law, the "idea of felony" was intertwined with the punishments of death and civil death. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 98 (1769) ("The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them ...."); Avery v. Everett , 110 N.Y. 317, 18 N.E. 148, 150 (1888) ("By the ancient common law ... [t]here were three principle incidents consequent upon an attainder for *459 treason or felony, forfeiture, corruption of blood, and an extinction of civil rights, more or less complete, which was denominated civil death."). Civil death was a state in which a person "though living, was considered dead"-a status "very similar to natural death in that all civil rights were extinguished." See Harry David Saunders, Note, Civil Death-A New Look at an Ancient Doctrine , 11 WM . & MARY L. REV. 988, 988-89 (1970). As originally conceived, civil death signified "a transitional status in the period between a capital sentence and its execution." Gabriel J. Chin, The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration , 160 U. PA. L. REV. 1789, 1797 (2012). It "was intended to merely settle the estate of an executed or banished felon." Saunders, 11 WM . & MARY L. REV. at 990.
During the period leading up to the founding, the connection between felonies and capital punishment started to fray. Once a short, specified list of offenses, felonies in England grew to "no less than an hundred and sixty," which is likely what forced Blackstone to define them in terms of their most common characteristic: capital punishment. See 4 BLACKSTONE , supra , at 18, 97-98. But as the number of designated felonies continued to grow, so did the variations on punishment, especially in the American colonies. Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on the whole, not capital." LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993). By the time the Constitution was ratified, James Wilson observed that while the term "felony" was once "very strongly connected with capital punishment," that was no longer true. JOHN D. BESSLER, CRUEL & UNUSUAL 52-53 (2012) (quoting 2 THE WORKS OF JAMES WILSON 348 (James DeWitt Andrews ed., 1896)); see also 6 NATHAN DANE, DIGEST OF AMERICAN LAW 715 (1823) ("[W]e have many felonies, not one punished with forfeiture of estate, and but a very few with death."). Of course, many crimes remained eligible for the death penalty, and the extent to which that was true varied by state. Death, however, no longer inevitably followed a felony conviction.
Because it was no longer defined with reference to a list of specific crimes or even a specific punishment, the definition of "felony" was difficult to pin down at the time of the founding. See Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic , 57 CLEV. ST. L. REV. 461, 465 (2009) (emphasizing the "ambiguity in the meaning of felony" at the founding). According to James Madison, "felony" was "a term of loose signification even in the common law of England," but more so in the States where "[t]he meaning of the term ... [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." THE FEDERALIST NO. 42, at 228 (J. R. Pole ed., 2005); see also DANE , supra , at 715 ("[T]he word felony , in the process of many centuries, has derived so many meanings from so many parts of the common law, and so many statutes in England, and has got to be used in such a vast number of different senses, that it is now impossible to know precisely in what sense we are to understand this word.").
The shift in punishment for felonies necessitated a shift in the meaning of civil death, which had been previously connected to a capital sentence. And so civil death came to be understood "as an incident of life conviction." See Saunders, 11 WM . & MARY L. REV. at 990; see also Troup v. Wood , 4 Johns. Ch. 228, 248 (N.Y. Ch. 1820) (a person convicted of felony and sentenced to imprisonment in the state *460 prison for life is "civiliter mortuus "). But applying the ancient concept of civil death in this context proved difficult. Because "[i]mprisonment for life was a punishment unknown to the common law," courts quickly realized that common-law civil death did not automatically apply. See Platner v. Sherwood , 6 Johns. Ch. 118, 122 (N.Y. Ch. 1822) (¶ 2 argument of Butler and Henry, counsel for the plaintiff); id. at 128 (Opinion of the Chancellor). Thus, courts soon decided that civil death applied only when statutes explicitly attached it to life sentences, and statutes did not universally do so. Id. at 129 (holding that a person convicted of a felony and sentenced to life imprisonment was not "deemed and taken to be civilly dead, to all intents and purposes in the law" until an act of the legislature made it so)[8] ; see also Frazer v. Fulcher , 17 Ohio 260, 262 (1848) ("But it is said that, by the rules of the common law, there is such a thing as a civil death as well as a natural death. We know that in England there are cases in which a man, although in full life, is said to be civilly dead, but I have not learned, until this case was brought before us, that there was but one kind of death known to our laws."); Cannon v. Windsor , 1 Houst. 143, 144, 6 Del. 143 (1855) ("But here there is no such general forfeiture of property, or the right to maintain an action, on a conviction for treason or felony, and the maxim or principle of civilter mortuus cannot therefore apply in this State, even when he is a party plaintiff."); Chin, 160 U. PA. L. REV. at 1796 ("In England, civil death was a common law punishment, but in the United States, it existed only if authorized by statute. It was far from universal...."). And even when it applied to life sentences, the doctrine of civil death had to be at least partially reconceived because it had begun as a time-limited doctrine justified by the anticipation of natural death-it was "not a condition applicable potentially for decades." See Chin, 160 U. PA. L. REV. at 1797. As courts hammered out the incongruities between civil death and continued life over the next century, they settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights.[9] See, e.g. , *461 Avery , 18 N.E. at 154-55 (suggesting that a life convict maintained a right to defend an action brought against him and certain property rights, including the ability to transfer property by will or deed).
Of particular relevance to Kanter's case, courts also struggled to determine how-if at all-the old concept of civil death applied to felons serving sentences for a term of years. Cases decided in the early nineteenth century, like Troup v. Wood and Platner v. Sherwood , associated the loss of rights under a theory of civil death only with capital and life sentences. Later cases building on that reasoning held that the rights of felons serving less than life were merely suspended during the term of the sentence. See, e.g. , In re Estate of Nerac , 35 Cal. 392, 396 (1868) ("If the convict be sentenced for life, he becomes civiliter mortuus , or dead in law.... If, however, he be sentenced for a term less than life, his civil rights are only suspended during the term."); Ruffin v. Commonwealth , 62 Va. 790, 796 (1871) (explaining that a convict is "civiliter mortuus, " but only "[f]or the time being, during his term of service in the penitentiary"); Bowles v. Habermann , 95 N.Y. 246, 247 (1884) (applying a statute, which provided that "a sentence of imprisonment in a State prison for any term less than for life ... suspends, during the term of the sentence, all the civil rights ... of, or held by, the person sentenced.").
The upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the governments suggest. Capital punishment was less pervasive than one might think. Outside the capital context, civil death applied exclusively to life sentences and only if authorized by statute-and even then, it was more modest than the ancient version because the convict retained some rights. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand.
Because they did not go hand-in-hand, the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided. Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law. This is not to say that felons could not lose rights under another theory. Indeed, state legislatures did explicitly exclude felons from the enjoyment of particular rights. See infra Section II.C. But history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class.
Even if it could be, though, one might reasonably ask: "So what?" We wouldn't draw this inference from the severity of founding-era punishment in other contexts-for example, we wouldn't say that *462 the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.
C.
While scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms, history does show that felons could be disqualified from exercising certain rights-like the rights to vote and serve on juries-because these rights belonged only to virtuous citizens. See THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness"); Saul Cornell, "Don't Know Much About History" The Current Crisis in Second Amendment Scholarship , 29 N. KY. L. REV. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). Some maintain that the right to bear arms is similarly limited by a virtue requirement. See, e.g., Don. B. Kates Jr., The Second Amendment: A Dialogue , 49 LAW & CONTEMP. PROBS. , Winter 1986, at 143, 146 ("[T]he right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue."). On this view, the legislature can disarm felons because of their poor character, without regard to whether they are dangerous. See Medina , 913 F.3d at 159 (endorsing the view that the Second Amendment excludes not only the dangerous, but also the "unvirtuous") The majority is sympathetic to this view. See Maj. Op. at 446.
The problem with this argument is that virtue exclusions are associated with civic rights-individual rights that "require[ ] citizens to act in a collective manner for distinctly public purposes." See Saul Cornell, A New Paradigm for the Second Amendment , 22 LAW & HIST. REV. 161, 165 (2004). For example, the right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance. Similarly, individuals do not serve on juries for their own sake, but as part of the collective enterprise of administering justice. Some scholars have characterized the right to keep and bear arms as a civic right, because it was "one exercised by citizens, not individuals ..., who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia." See Cornell & DeDino, 73 FORDHAM L. REV. at 491 ("[T]he text [of the Second Amendment] fits a civic rights model better than either the individual or collective rights paradigms."). Saul Cornell explains:
Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner. Freedom of religion, freedom of the press, trial by jury were genuinely rights belonging to individuals and were treated differently than were civic rights such as militia service, or the right to sit on juries.
Cornell, 29 N. KY. L. REV. at 679 (footnotes omitted). And as a right that was exercised *463 for the benefit of the community (like voting and jury service), rather than for the benefit of the individual (like free speech or free exercise), it belonged only to virtuous citizens.
Heller , however, expressly rejects the argument that the Second Amendment protects a purely civic right. Moore v. Madigan , 702 F.3d 933, 935 (7th Cir. 2012). It squarely holds that "the Second Amendment confer[s] an individual right to keep and bear arms," Heller , 554 U.S. at 595, 128 S.Ct. 2783 (emphasis added), and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself-not in his right to serve in a well-regulated militia, id. at 582-86, 128 S.Ct. 2783. The "civic rights" approach runs headlong into both propositions. See Binderup , 836 F.3d at 371 (Hardiman, J., concurring in part and concurring in the judgments) ("[T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre- Heller interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who rejected the view that the Amendment confers an individual right and instead characterized the right as a 'civic right....' " (citation omitted)). The parties have introduced no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights.[10] And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment.
It bears emphasis that virtue exclusions from the exercise of civic rights were explicit. If the right to bear arms was similarly subject to a virtue exclusion, we would expect to see provisions expressly depriving felons of that right too-but we don't. By 1820, ten states' constitutions included provisions excluding or authorizing the exclusion of those who "had committed crimes, particularly felonies or so-called infamous crimes" from the franchise. See ALEXANDER KEYSSAR, THE RIGHT TO VOTE 62-63 & tbl. A.7 (Kentucky, Vermont, Ohio, Louisiana, Indiana, Mississippi, Connecticut, Illinois, Alabama, Missouri). By 1857, twenty-four state constitutions included such provisions. Id. The same crimes often "made a person ineligible to serve as a witness in a legal proceeding," id. at 62, and to serve on a jury.[11]
State constitutions protecting the right to bear arms do not follow a similar pattern. Between 1790 and 1820, nine states enacted their own right-to-arms provisions in their constitutions. See Volokh, 11 TEX. REV. L. & POL. at 208-09 (four more had *464 enacted such provisions prior to 1790). None of those provisions made an exception for criminals. Id. And notably, seven of those nine states explicitly excluded or authorized the exclusion of certain criminals from the right to vote. Compare id. (identifying Kentucky, Ohio, Indiana, Mississippi, Connecticut, Alabama, and Missouri as seven of the nine states with right-to-arms provisions in their constitutions by 1820), with KEYSSAR , supra , at tbl. A.7 (the same seven state constitutions specifically excluded certain criminals from the right to vote). The same pattern held true in 1857. Compare Volokh, 11 TEX. REV. L. & POL. at 209-10, with KEYSSAR , supra , at tbl. A.7. There is no basis, then, for assuming that a virtue requirement on the right to vote applies equally to the right to keep and bear arms. See Binderup , 836 F.3d at 372 (Hardiman, J., concurring in part and concurring in the judgments) ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right-contemporary insistence to the contrary falls somewhere between guesswork and ipse dixit .").[12]
In sum, the available evidence suggests that the right to arms differs from rights that depend on civic virtue for enjoyment. The Second Amendment confers an individual right, intimately connected with the natural right of self-defense, and not limited to civic participation (i.e., militia service). By the very terms of the civic-rights argument, then, the right to arms would have been "treated differently" than rights like the right to vote or to sit on juries. See Cornell, 29 N. KY. L. REV. at 679 ("[R]ights belonging to individuals ... were treated differently than were civic rights such as militia service, or the right to sit on juries."). And that difference is borne out by historical treatment: we see no explicit criminal, or even more general virtue-based, exclusions from the right to bear arms like we do in other contexts. Thus, although the right protected by the Second Amendment is not unlimited, see Heller , 554 U.S. at 595, 128 S.Ct. 2783, its limits are not defined by a general felon ban tied to a lack of virtue or good character.
III.
The history canvassed in Part II yields two conclusions that are important for present purposes. History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous. Our precedent is consistent with this principle: we have held that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." Skoien , 614 F.3d at 641. Instead, the legislature can make that judgment on a class-wide basis. See id. at 640 ("That some categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety; as we said in Skoien , *465 "exclusions need not mirror limits that were on the books in 1791." Id. at 641. Such restrictions are "lineal descendants" of historical laws banning dangerous people from possessing guns. See Transcript of Oral Argument at 77, Heller, 554 U.S. 570 (No. 07290) (Chief Justice Roberts: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well.").
That said, "the government does not get a free pass simply because Congress has established a 'categorical ban.' " United States v. Williams , 616 F.3d 685, 692 (7th Cir. 2010). The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun. See Skoien , 614 F.3d at 641 ("We do not mean that a categorical limit on the possession of firearms can be justified under the rational-basis test, which deems a law valid if any justification for it may be imagined."). The legislature must be able to justify its designation, and the rigor with which we review this justification "depends on 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.' " Ezell II , 846 F.3d at 892 (citation omitted). "Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-ends fit...." Id.
The majority contends that the means-end review should be "arguably less rigorous in this case because ... felon dispossession laws do not restrict the 'core right of armed defense,' but rather burden 'activity lying closer to the margins of the right.' " Maj. Op. at 448 n.10 (quoting Ezell II , 846 F.3d at 892 ). I disagree. First, felon dispossession statutes target the whole right, including its core: they restrict even mere possession of a firearm in the home for the purpose of self-defense. Cf. Heller , 554 U.S. at 630-35, 128 S.Ct. 2783 (finding unconstitutional a law that made it impossible for citizens to use firearms for "the core lawful purpose of self-defense"); id. at 628, 128 S.Ct. 2783 ("[T]he inherent right of self-defense has been central to the Second Amendment right.").[13] And second, the burden is severe: it is a permanent disqualification from the exercise of a fundamental right. See Maj. Op. at 439-40; see also United States v. McCane , 573 F.3d 1037, 1048-49 (10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he broad scope of § 922(g)(1) -which permanently disqualifies all felons from possessing firearms-would conflict with the 'core' self-defense right embodied in the Second Amendment."). Thus, "a very strong public-interest justification and a close means-ends fit" is required before Kanter may be constitutionally subject to the United States and Wisconsin dispossession statutes. Ezell II , 846 F.3d at 892.
There is no question that the interest identified by the governments and supported by history-keeping guns out of the hands of those who are likely to misuse them-is very strong. And we have held *466 that several of the other categorical bans within § 922(g) demonstrate the necessary fit between this public-safety end and the government's chosen means. In Skoien , we upheld § 922(g)(9), which prohibits those convicted of domestic violence misdemeanors from possessing firearms, because "no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective" and "[b]oth logic and data establish a substantial relation between § 922(g)(9) and this objective." 614 F.3d at 642; see also id. at 644 ("[N]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners."). In United States v. Yancey , we sustained § 922(g)(3), which prohibits any person "who is an unlawful user of or addicted to any controlled substance" from possessing a gun, because "studies amply demonstrate the connection between chronic drug abuse and violent crime, and illuminate the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime." 621 F.3d 681, 686 (7th Cir. 2010). And in United States v. Meza-Rodriguez , we rejected a challenge to § 922(g)(5), which prohibits aliens unlawfully present in the United States from possessing firearms, reasoning that keeping guns out of the hands of "persons who are difficult to track and who have an interest in eluding law enforcement" serves the public-safety objectives of § 922(g). 798 F.3d 664, 673 (7th Cir. 2015).
In contrast to these narrowly defined categorical bans, § 922(g)(1), which applies to all felons, is "wildly overinclusive." Adam Winkler, Scrutinizing the Second Amendment, 105 MICH. L. REV. 683, 721 (2007). Its application is not limited to those who have committed violent crimes like murder, assault, and rape.[14] It also encompasses those who have committed any nonviolent felony or qualifying state-law misdemeanor-and that is an immense and diverse category. It includes everything from Kanter's offense, mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses. See Mass. Gen. Laws ch. 129, §§ 39, 43 ; Mich. Comp. Laws § 445.574a(1)(a), (2)(d) ; see also, e.g. , 21 U.S.C. § 676 (violating the Federal Meat Inspection Act in certain ways); 18 U.S.C. § 1621 (committing perjury); Mass. Gen. Laws ch. 266, § 30A (shoplifting goods valued at $100).[15] These *467 crimes, like many others captured by § 922(g), "rais[e] no particular suspicion that the convict is a threat to public safety." Winkler, 105 MICH. L. REV. at 721. Put more colorfully, "It is hard to imagine how banning Martha Stewart or Enron's Andrew Fastow from possessing a gun furthers public safety." Id.
We have addressed the constitutionality of § 922(g)(1) before. In United States v. Williams, a defendant with a prior robbery conviction challenged the statute as applied to him. 616 F.3d at 691. We held that the provision is constitutional as applied to violent felons, including the defendant in that case. 616 F.3d at 694 ("Because Williams was convicted of a violent felony, his claim that § 922(g)(1) unconstitutionally infringes on his right to possess a firearm is without merit."). But our decision came with an important qualification: we expressly noted that " § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." Id. at 693. We asserted that "[e]ven if the government may face a difficult burden of proving § 922(g)(1) 's 'strong showing' in future cases, it certainly satisfies its burden in this case, where [the defendant] challenges § 922(g)(1) as it was applied to him." Id. As a violent felon, the defendant in Williams was in no position to challenge § 922(g)(1) on the ground that its application to nonviolent felons is unconstitutional. See Skoien , 614 F.3d at 645 ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."). As a nonviolent felon, however, Kanter is in a position to make that argument.
The first step in analyzing Kanter's as-applied challenge is to consider whether banning all nonviolent felons is substantially related to the governments' interest in preventing future gun violence. See Williams , 616 F.3d at 692-93. Williams held that because the characteristic common to all violent felons is a demonstrated propensity for violence, the ban on possessing firearms is constitutional as applied to all members of that class. Id. at 693-94. In contrast, and to state the obvious, the characteristic common to all nonviolent felons is that their criminal conduct was nonviolent.[16] Thus, the reasoning that supports the categorical disarmament of violent felons-that past violence is predictive of future violence-simply does not apply.
The governments argue, though, that being convicted of a nonviolent crime is also predictive of future violence. They try to support that position with statistics showing that nonviolent felons are likely to commit violent crimes in the future. These statistics are entirely unhelpful, however, because they lump all nonviolent felons together-and while some nonviolent felons may be likely to misuse firearms, the characteristics that make them risky cannot *468 be generalized to the whole class. For example, the characteristics of an individual convicted of a drug-related offense tell us little if anything about the tendency of an individual convicted of perjury-or, for that matter, mail fraud-to commit gun violence. The sheer diversity of crimes encompassed by these statutes makes it virtually impossible for the governments to show that banning all nonviolent felons from possessing guns is closely tailored to the goal of protecting the public safety. Thus, we must decide whether the statutes are unconstitutional as applied to Kanter in particular. See Williams , 616 F.3d at 692-93.
If Kanter's conviction-mail fraud-is substantially related to violent behavior, the governments can disarm him without regard to any personal circumstances or characteristics suggesting that he poses a low risk to public safety. But their case for tying mail fraud to a risk of future violence rests on a single study related to mail-fraud recidivism. See DAVID WEISBURD ET AL., WHITE-COLLAR CRIME AND CRIMINAL CAREERS (2004). This study suggests that almost 40% of individuals convicted of mail fraud were later rearrested. Id. at 29. It does not say, however, whether those arrests were for violent or nonviolent offenses. Nor does it say what percentage of those individuals were convicted. A different portion of the same study suggests that 25% of all white-collar repeat offenders (on the numbers provided, I'll assume that means roughly 10% of those with a mail-fraud conviction, though we have been given no way to know)[17] have an arrest for a violent crime. Id at 45. But it does not specify whether the violent arrest preceded or post-dated the white-collar arrests, and the numbers drop dramatically for those with only two total offenses, id. , suggesting that a pattern of criminality, rather than a particular mail-fraud arrest, might be an indication of future dangerousness, see id. at 46 ("[T]hose with fewer arrests seldom had violent crimes in their criminal histories."). This study falls well short of establishing the "close means-ends fit" required before the governments may totally and permanently strip offenders like Kanter of the ability to exercise a fundamental right.[18]
This does not mean that Wisconsin and the United States cannot disarm Kanter. Even though the mail-fraud conviction, standing alone, is not enough, they might still be able to show that Kanter's history or characteristics make him likely to misuse firearms. And if banning Kanter, in particular, from possessing a gun is substantially related to the governments' goal of "preventing armed mayhem," then the statutes could be constitutionally applied to him. Skoien , 614 F.3d at 642.
At this point, however, neither Wisconsin nor the United States has presented any evidence that Kanter would be dangerous if armed. Instead, as the majority notes, "Kanter is a first-time, non-violent offender with no history of violence, firearm misuses, or subsequent convictions," and he is "employed, married, and does not use illicit drugs, all of which correspond *469 with lower rates of recidivism." Maj. Op. at 449. Absent evidence that Kanter would pose a risk to the public safety if he possessed a gun, the governments cannot permanently deprive him of his right to keep and bear arms.
* * *
If the Second Amendment were subject to a virtue limitation, there would be no need for the government to produce-or for the court to assess-evidence that nonviolent felons have a propensity for dangerous behavior. But Heller forecloses the "civic right" argument on which a virtue limitation depends. And while both Wisconsin and the United States have an unquestionably strong interest in protecting the public from gun violence, they have failed to show, by either logic or data, cf. Skoien , 614 F.3d at 642, that disarming Kanter substantially advances that interest. On this record, holding that the ban is constitutional as applied to Kanter does not "put[ ] the government through its paces," see Williams , 616 F.3d at 692, but instead treats the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," McDonald v. City of Chicago , 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion). I therefore dissent.

Because the federal and state statutes operate to the same effect as applied to Kanter, my analysis applies equally to both. For simplicity's sake, I often refer only to the federal statute. In addition, I sometimes refer to the statutes as imposing a "felon ban" or "felon dispossession" with the understanding that § 922(g)(1) also encompasses state misdemeanors punishable by more than two years in prison. See 18 U.S.C. § 921(a)(20)(B).

Or at least that would be true absent the unlikely event that the Second Amendment, as originally understood, imposed a very specific restriction on the length of time that such a misdemeanant was excluded from the right.

Felon disenfranchisement laws have a long history, and the Fourteenth Amendment's protection of the right to vote expressly acknowledges the authority of state legislatures to enact such laws. U.S. Const. amend. XIV, § 2 (providing that a state's representation in the House will be reduced if the right to vote "is denied ... or in any way abridged, except for participation in rebellion, or other crime"). The Second Amendment contains no similar acknowledgement. Legislative power to strip the right from certain people or groups was nonetheless a historically accepted feature of the pre-existing right that the Second Amendment protects. See Heller , 554 U.S. at 592, 128 S.Ct. 2783 ("[T]he Second Amendment ... codified a pre-existing right."); id. at 595, 128 S.Ct. 2783 ("Of course the right was not unlimited ...."); Skoien , 614 F.3d at 640 ("That some categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). Thus, such a regulation does not "infringe" the right to bear arms because the right was always qualified by the government's power to prevent the dangerous from exercising it.

This common-law offense was adapted from the 1328 Statute of Northampton, which decreed that a person may not "go nor ride armed by night nor by day in fairs, markets, ... nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328). By the middle of the seventeenth century, the statute was "almost gone in desuetudinem," because the law recognized "a general connivance to gentlemen to ride armed for their security." Rex v. Knight , 90 Eng. Rep. 330, 330 (K.B. 1686). But it was still enforced against those who violated the terms of the statute "malo animo," id. -that is, those who carried arms with intent "to terrorize their neighbors," see Joyce Lee Malcolm, To Keep and Bear Arms at 104 (1994).

To be sure, the American experience does not map on exactly to the English one. For one thing, the right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights. See Malcolm , supra , at 162. Still, the American version was derived from its English predecessor, see id. at 150, 164, which makes English practice instructive. That is especially true when the patterns from English practice repeat themselves in American law.

First, the allegiance required was to the Crown, and later, it was to the sovereign and independent states. See id. at 159 & n.49 (quoting 4 Journals of the Continental Congress , 1774-1789, at 201-05 (1906) (calling for the disarmament of those "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies")).

It should go without saying that such race-based exclusions would be unconstitutional today.

The same court had two years earlier suggested that where a statute changed punishment from death to a life sentence, the statute may be read as an affirmance of the common law punishment of civil death. See Platner , 6 Johns. Ch. at 127-28 (citing Troup , 4 Johns. Ch. 228 ). But in Platner , the court explicitly rejected its earlier assumption and replaced it with a well-reasoned, widely-adopted, and enduring view that civil death existed only if authorized by statute. Id. at 128 ("The same point arose, incidentally, in respect to this same conviction, in the case of Troup v. Wood , and I was there induced to think, upon the authority of Lord Coke , that every person attainted of felony was accounted, in law, civiliter mortuus . It was not a necessary or very material point in that case, and I did not pursue the subject to the extent I should have done, if it had been then, as it is now, the direct and material point in issue. I have, likewise, since, had the benefit of a full and able discussion, and of a diligent and accurate research, particularly on the part of the plaintiff, respecting this very unusual question of law." (citation omitted)).

Courts were consistent and explicit about the difficulty of trying to apply the doctrine of civil death outside the context of the death penalty. See, e.g. , Shapiro v. Equitable Life Assur. Soc. of U.S. , 182 Misc. 678, 45 N.Y.S.2d 717 (N.Y. Sup. Ct. 1943) ("Palpable anomaly inevitably results from attempting to attribute civil death, not only to persons about to be executed, but, also, to persons who may remain physically alive for many years and also may be paroled of pardoned."); Byers v. Sun Sav. Bank , 41 Okla. 728, 139 P. 948, 949 (1914) ("[Civil death] had its origin in the fogs and fictions of feudal jurisprudence and doubtlessly has been brought forward into modern statutes without fully realizing either the effect of its literal significance or the extent of its infringement upon the spirit of our system of government. At any rate, the full significance of such statutes have never been enforced by our courts for the principal reason that they are out of harmony with the spirit of our fundamental laws and with other provisions of statutes."); Avery , 18 N.E. at 155 ("Any one who takes the pains to explore the ancient and in many respects obsolete learning connected with the doctrine of civil death in consequence of crime, will find that he has to grope his way along paths marked by uncertain, flickering, and sometimes misleading lights; and he cannot feel sure that at some point in his course he has not missed the true road."). But here, defining the precise impact of "civil death" on a felon sentenced to life is not as important as underscoring that the impact was no longer complete destruction of rights and death to the law.

The governments gesture towards Heller as support for a virtue exclusion, citing Heller 's assertion that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635, 128 S.Ct. 2783. That statement implies that the legislature might have the power to more heavily regulate those who are not law-abiding or responsible. But it does not purport to analyze the scope of that power, nor does it endorse the very specific concept of a virtue exclusion.

See, e.g. , Act of Feb. 28, 1803, ch. 92, § 1, in Acts and Laws of the Commonwealth of Massachusetts 173 (Wright & Potter 1898) (jurors must be "of good Moral Character" and qualified to vote; "and if any person, whose name shall be put into either [jury] Box, shall be convicted of any Scandalous crime, or be guilty of any gross immorality, his name shall be withdrawn from the [jury] Box, by Selectmen of his town"); Act of Feb. 2, 1811, ch. 158, § 2, in 4 Laws of the State of Delaware , at 445, 449 (Bradford & Porter 1816) (grand jurors must be "sober, substantial and judicious freeholders, lawful men, of fair characters"); id. § 7 (petit jurors must be "sober, discreet and judicious freeholders,... lawful men of fair characters"); Act of Dec. 17, 1796, § 52, in Acts for the Commonwealth of Kentucky 134 (Stewart 1796) (jurors must "be of good demeanor").

The fact that the first general prohibition on felon gun possession was not enacted until 1961 further undercuts the argument that either history or tradition supports a virtue-based restriction on the right. See An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961) (amending the Federal Firearms Act by "deleting the words 'crime of violence' ... and inserting in lieu thereof the words 'crime publishable by imprisonment for a term exceeding one year' ").

The majority suggests that who exercises the right changes what the core of the right is, see Maj. Op. at 448 n.10, but that is circular. Heller distinguishes the two inquiries: First, it held that the District of Columbia's ban on handgun possession violated the Second Amendment (the what ). 554 U.S. at 635, 128 S.Ct. 2783. Then, it indicated the need to consider whether Heller could be disqualified from exercising that right (the who ). Id. ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). Heller's qualification or lack thereof did not change the content of the right itself; it affected whether the legislature could take it away. The same is true of Kanter here.

Section 922(g)(1) 's predecessor, the Federal Firearms Act of 1938, did not permanently ban all felons from possessing firearms, but rather those convicted of "crime[s] of violence," defined then as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," and certain forms of aggravated assault. See Marshall, 32 Harv. J.L. & Pub. Pol'y at 698-99 (citing Federal Firearms Act, ch. 850, § 1(6), 52 Stat. 1250, 1250 (1938)). Even today, many scholars cited as supporting a general felon ban actually seem to assume or advocate something much closer to a violent -felon ban. See, e.g. , Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations , 60 Hastings L. J. 1339, 1362-63 (2009) ("At early common law, the term 'felony' applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery.... Insofar as federal or state statutes would seek to bar arms possession by [felons who 'pos[e] no physical danger to others'], those laws would seem to be invalid on their face."); Stephen P. Halbrook, What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms" , 49 Law & Contemp. Probs. , Winter 1986, at 151, 161 ("[V]iolent criminals , children, and those of unsound mind may be deprived of firearms...." (emphasis added)).

It's worth noting that, in addition to the eclectic and wide-ranging offenses already included in this category, there are very few limits on the ability of Congress and state legislatures to expand the number of qualifying nonviolent offenses. Cf. United States v. Phillips , 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) ("Can Congress or the States define petty larceny as a felony? Of course. Can a conviction for stealing a lollipop then serve as a basis under § 922(g)(1) to a ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment?").

The majority suggests that nonviolent felonies are united by another characteristic relevant to the constitutionality of disarmament: that the commission of "mala in se felonies reflect[s] grave misjudgment and maladjustment." Maj. Op. at 450 (citation omitted). But that is just another way of saying that nonviolent felons have demonstrated a lack of virtue. Absent evidence that this lack of virtue is tied to a propensity for risky behavior that threatens public safety, it does not justify stripping them of their Second Amendment rights.

This assumes that the rate of violent arrest for mail fraudsters who reoffend tracks that of all white-collar criminals who reoffend. The governments' study doesn't speak to this question, underscoring the inability of the data provided to support the governments' arguments.

My analysis is limited to the total bans that Congress and the Wisconsin legislature enacted. It might be that this study or other evidence would support other, more limited intrusions on Kanter's Second Amendment right. But the constitutionality of a more limited measure (for example, a temporary ban or one that limits the places in which Kanter can have a gun) is not presented by this case.